**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| DENISE LANGSTON, | CASE NO. 1:15-cv-01117-CCC-GBC |
| Plaintiff, | (JUDGE CONNER) |
| | (MAGISTRATE JUDGE COHN) |
| v. | |
| CAROLYN W. COLVIN, COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND FOR FURTHER PROCEEDINGS |
| Defendant. | Docs. 1, 10, 11, 13, 17, 18 |

## REPORT AND RECOMMENDATION

### I.     Procedural Background

On February 15, 2012, Denise Langston ("Plaintiff") filed as a claimant for disability benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a last insured date of September 30, 2016,[1] and claimed a disability onset date of July 28, 2011.  (Administrative Transcript (hereinafter, "Tr."), 13, 15).

After the claim was denied at the initial level of administrative review, the

---

[1] Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

Administrative Law Judge (ALJ) held a hearing on October 15, 2013. (Tr. 29-72). On December 20, 2013, the ALJ found that Plaintiff was not disabled within the meaning of the Act. (Tr. 10-28). Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on April 7, 2015, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner. (Tr. 1-6).

On June 6, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits. (Doc. 1). On August 7, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings. (Doc. 10, 11). On September 20, 2015, Plaintiff filed a brief in support of the appeal. (Doc. 13 ("Pl. Brief")). On October 23, 2015, Defendant filed a brief in response. (Doc. 17 ("Def. Brief")). On October 30, 2015, Plaintiff filed a reply brief. (Tr. 18 ("Reply")). On January 11, 2016, the Court referred this case to the undersigned Magistrate Judge.

## II. Relevant Facts in the Record
### A. Education, Age, and Vocational History

Plaintiff was born in May 1976 and was classified by the Regulations as a younger individual through the date of the ALJ decision. (Tr. 127); 20 C.F.R. § 404.1563(c). The highest level of education that Plaintiff completed was high school with the assistance of special education classes. (Tr. 257). Plaintiff's past

relevant work was as a fast food worker.  (Tr. 22).  Plaintiff asserts that she is disabled due to depression, anxiety, posttraumatic stress disorder (PTSD), and mitochondrial muscle disease.  (Tr. 256).

Earnings reports demonstrate that from 1993 to 2011, Plaintiff has worked several jobs for different employers and show that from 2001 to 2011 Plaintiff earned three to four quarters of coverage annually.[2]  (Tr. 232-33).

## B. Relevant Treatment History and Medical Opinions

### 1. WellSpan Health, York Hospital: Stephen Dilts, Jr., M.D.

Plaintiff was hospitalized at York Hospital from May 28, 2010, to June 1, 2010, with complaints of depression and suicidal thoughts.  (Tr. 312, 314).  In a discharged summary sated June 1, 2010, Dr. Dilts listed Plaintiff's diagnostic impression as including: depressive disorder, Not Otherwise Specified (NOS); chronic back pain; hypertension; mitochondrial muscle disease; severe Axis IV stress factors including parenting issues, finances, poor coping, and relationship with her husband.  (Tr. 312).  She was assigned GAF score of 25 on admission and discharged with a GAF score of 65.  (Tr. 312).  She reported that she had always been depressed since a very young age and has had chronic intermittent suicidal thoughts since age 10.  (Tr. 312).  It was noted that her 2.5-year-old son passed

---

[2] Quarter of coverage represents a minimum amount of taxable based on a statutory formula that reflects a national average wages.  *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n.4 (M.D. Pa. Sept. 30, 2015).

away six years prior due to climbing on dresser drawers which fell on him and crushed his windpipe.  (Tr. 312).   Her symptoms were noted as weight loss, lethargy, auditory hallucinations, and crying spells.  (Tr. 312, 317).  She reported that on May 26, 2010, she was crying, left the house and ended up leaving the 6-year old home alone.  (Tr. 313).   Police and Children and Youth Services were notified and the child was placed in the custody of her husband's parents.  (Tr. 313).  On mental status examination, the doctor observed that she was tearful and exhibited passive suicidal thoughts.  (Tr. 317).  It was noted that her insight and judgment were moderately impaired. (Tr. 317).  She participated in group and individual activities at the hospital. (Tr. 314).

### 2.   WellSpan Behavioral Health: Kristi Schippers, Psy.D.

On January 5, 2011, it was noted that she had not been seen for six months, was off her medication for several months without any therapy and reported to be "sad." (Tr. 335).  On June 22, 2011, Plaintiff reported that she stopped a job that was "too stressful" and it is noted that she "still has regular job."  (Tr. 333).  It is noted that Plaintiff says she is "ok" but is at risk for decompensation without therapy.  (Tr. 333).

During an assessment on July 1, 2011, Plaintiff reported feeling depressed and having nightmares and dreams regarding past trauma.  (Tr. 331).  Plaintiff reported that her husband was "very controlling" and yelled at her if she's gone too

long, does not let her friend in the house and does not allow her to talk to people. (Tr. 331). It was noted that she does not drive and that her husband does not always take her to get her medication when she needs it. (Tr. 331). It was also noted that she was incarcerated for six months for reckless endangerment leading to the death of her first son and was on probation for five years for leaving her young son at home alone. (Tr. 331). The doctor observed that Plaintiff's immediate and remote memory were intact, her judgement and insight were fair, and she exhibited a depressed mood. (Tr. 331). It was noted that he had no phone in the house. (Tr. 331). Dr. Schippers diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features and assessed her with a GAF score of 45. (Tr. 332). Dr. Schippers recommended individual therapy. (Tr. 332).

### 3.    Family Practice Center

On August 30, 2011, Plaintiff received a depression evaluation at the Family Practice Center. (Tr. 343). She had no suicidal/homicidal ideation, and denied anxiety, hallucinations, or sleep pattern disturbance. (Tr. 343). Her motor activity was within normal limits and her affect was appropriate. (Tr. 344). Plaintiff showed good eye contact; had clear and fluent speech; coherent and logical thought process; displayed no delusions, hallucinations, obsessions, preoccupations, or somatic thoughts; had normal attention span and concentration; had realistic judgment; and had appropriate insight. (Tr. 344). However, she stated

that she was going through a divorce, which created more stress and worsened her depression. (Tr. 343). Plaintiff also reported that she had no ambition and difficulty concentrating. (Tr. 343).

### 4.     NHS Steven's Center: Henry Wehman, M.D.

On December 15, 2011, Plaintiff was seen by Dr. Wehman. (Tr. 354-55). Plaintiff described a depressed mood, frequent crying, and poor sleep but endorsed normal appetite, and no anhedonia, panic attacks, or suicidal ideation. (Tr. 354). Following the death of her son, Plaintiff reported nightmares and auditory hallucinations. (Tr. 354). Her attire and attention to personal hygiene were unremarkable; she showed no abnormal voluntary movements; her content of thought was without delusions, obsessions, phobias, or suicidal/homicidal ideation; her cognitive functions were within normal limits, although her speech was circumstantial; her affect was constricted; her mood was depressed and anxious, with limited insight and questionable judgment; and she endorsed auditory hallucinations and nightmares. (Tr. 355). Dr. Wehman assessed a Global Assessment of Function (GAF)[3] score of 50. (Tr. 355). He advised that Plaintiff continue counseling and adjusted her medication. (Tr. 356).

---

[3] *See Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). A GAF score is set within a particular range if either the symptom severity or the level of functioning falls within that range. *Id.* The score is useful in planning treatment and predicting outcomes. *Id.* The GAF

Plaintiff followed up with Dr. Wehman in January and April 2012, noting that her medications were effective. (Tr. 353). Plaintiff's general appearance was "okay." (Tr. 353). She had relevant, productive, and goal-directed speech, euthymic mood, normal stream and content of thought, no suicidal/homicidal ideation, generally intact cognitive/executive functions, no nightmares, and mildly intense affect. (Tr. 353, 357). The January and April examinations both revealed that she had a GAF score of 70, on the borderline between mild and transient symptoms. (Tr. 353).

In July 2012, Dr. Wehman noted that Plaintiff planned to move to another city to live with her boyfriend. (Tr. 374). Plaintiff had relevant, productive, and goal-directed speech, normal stream and content of thought, no suicidal/homicidal ideation, generally intact cognitive/executive function, and intense affect and dysphoric mood. (Tr. 374). Her GAF score was 60. (Tr. 374).

Treatment records dated January 8, 2013, noted that Plaintiff had moved away, and had now returned for services after an absence of six months without

---

rating is the single value that best reflects the individual's overall functioning at the time of examination. The rating, however, has two components: (1) symptom severity and (2) social and occupational functioning. The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. . . . . A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.*").

treatment.  (Tr. 385).  Plaintiff stated that she would like to get a job and had applied to local establishments for work.  (Tr. 385-86).  Her interests included hunting and crossword puzzles. (Tr. 387).  Her GAF score was 45. (Tr. 386).

In March 2013, Dr. Wehman saw Plaintiff for the first time in six months. (Tr. 373).  Plaintiff had relevant, productive, and goal-directed speech, normal affect, normal stream and content of thought, generally intact cognitive/executive functions, and no suicidal/homicidal ideation.  (Tr. 373).  She claimed she was depressed and reported auditory hallucinations.  (Tr. 373). Dr. Wehman noted that she had no medication for one year.  (Tr. 373).  Her GAF score was 60.  (Tr. 373). A follow up in April revealed Plaintiff ''believe[d] [her] present regimen [of medication] [wa]s good," she was making progress, and her GAF improved to 65. (Tr. 372).

In a treating record dated April 8, 2013, Plaintiff reported interests included being outside, hunting, helping the landlord with projects on the property and with his gun shop, and talking to her boyfriend on the phone. (Tr. 384).  Her GAF score was 50.  (Tr. 384).

At a July 22, 2013 appointment with Dr. Wehman, Plaintiff indicated that she got engaged.  (Tr. 371).  Plaintiff had relevant, productive and goal-directed speech, normal affect, euthymic mood, normal stream and content of thought, no suicidal/homicidal ideation, no hallucinations, generally intact cognitive/executive

functions, and a GAF score of 75.  (Tr. 371).  She stated that her medications were "okay."  (Tr. 371).

An NHS treatment plan dated July 22, 2013, indicated that Plaintiff was seen only once per month for maintenance and her probation requirement.  (Tr. 378). Plaintiff's short-term goals included taking breaks, such as camping, and continuing to look for employment.  (Tr. 379).  She stated that she was very good at outside work such as landscaping, and talking to her boyfriend.  (Tr. 380).  Her GAF score was 60.  (Tr. 380).

On August 30, 2013, Plaintiff saw Dr. Wehman.  (Tr. 370).  Although she presented as agitated, with a constricted affect, and dysphoric mood, she had a normal stream and content of thought, no homicidal/suicidal ideations, no hallucinations, and generally intact cognitive/executive functions.  (Tr. 370).  Her prescription of Haldol was satisfactory to prevent visual hallucinations.  (Tr. 370). Her GAF score was 60.  (Tr. 370).

On September 23, 2013, Dr. Wehman found that Plaintiff had relevant, productive, and goal-oriented speech, but was agitated and paranoid, with an anxious mood and auditory hallucinations.  (Tr. 394).  Her GAF score was 40.  (Tr. 394).  Dr. Wehman noted that he needed to complete a residual functional capacity form for Plaintiff.  (Tr. 394).

On September 24, 2013, Dr. Wehman completed a Mental Residual Functional Capacity Form.   (Tr. 388).   Dr. Wehman opined that Plaintiff had deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner and repeated episodes of deterioration or decompensation in work or work-like settings, which caused the patient to withdraw from the situation or experience exacerbation of signs and symptoms. (Tr. 389).   In contrast with the October 2013 opinion, Dr. Wehman checked the box indicating that Plaintiff did not have a complete inability to function independently outside the home due to panic attacks.  (Tr. 389).

Dr. Wehman checked boxes indicating that Plaintiff was "extremely'' impaired in the ability to work in coordination with and proximity with others without being distracted by them, complete a normal workday/workweek and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, and travel in unfamiliar places or use public transportation.   (Tr. 390-91).   Dr. Wehman opined that Plaintiff had "marked" impairments in the ability to get along with coworkers or others without distracting them or exhibiting behavioral extremes and in the ability to set realistic goals and make plans independently of others.  (Tr. 390-91).

In a Mental Impairment Questionnaire dated October 21, 2013, Dr. Wehman assessed a GAF score of 40.   (Tr. 398-402).   Dr. Wehman checked boxes indicating that Plaintiff's symptoms included anhedonia or pervasive loss of interest in all activities, decreased energy, feelings of guilt or worthlessness, mood disturbance, persistent disturbances of mood or affect, paranoid thinking or inappropriate suspiciousness, hallucinations or delusions, memory impairment, and sleep disturbance.  (Tr. 399).  Dr. Wehman opined that Plaintiff had no or mild restrictions of activities of daily living and maintaining social function, no episodes of decompensation, and marked difficulties in maintaining concentration, persistence or pace.  (Tr. 402).  Dr. Wehman also indicated that Plaintiff had an anxiety disorder and a complete inability to function independently outside the home.  (Tr. 402).  Dr. Wehman checked boxes indicating that Plaintiff had "no useful ability to function," was "unable to meet competitive standards" or was "seriously limited, but not precluded," in several areas.  (Tr. 400-01).

### 5.     State Agency Consultant Opinion: Louis Poloni, Ph.D.

In a Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment dated April 17, 2012, Dr. Poloni opined that Plaintiff's impairments were not of a Listing-level severity, and that she had no significant limitations in remembering locations and work-like procedures, understanding and remembering short and simple instructions.  (Tr. 76-79).  He further found Plaintiff

had no limits in sustained concentration and persistence, social interaction, or adaption.  (Tr. 79).

### 6.     Third Party Adult Function Report: Marjorie Huff

In a report dated March 9, 2012, Plaintiff's sister, Ms. Huff, noted that Plaintiff lived in the house with her and that she spent time with her helping to clean the home.   (Tr. 285).   She stated that Plaintiff was "unbalanced," had hallucinations, had "mental problems," was "very slow," and "very depressed." (Tr. 265).   Ms. Huff stated that Plaintiff does not handle stress or changes in routine well, talks to herself, and is "unstable in movement and mood swings." (Tr. 271-72).  Miss Huff reported that Plaintiff could read, do dishes, feed pets, and fold clothes.  (Tr. 267).  According to Ms. Huff, Plaintiff has no problems with personal care.  (Tr. 266).  Ms. Huff reported that Plaintiff infrequently shops by herself in stores for household and personal items, and when she does, it takes "forever" and she "spaces out."  (Tr. 268).  However, Plaintiff will join Ms. Huff to shop twice a week.  (Tr. 269).  Ms. Huff reported that Plaintiff was unable to pay bills, handle a savings account, and unable to use a checkbook, explaining that Plaintiff has to be told what and when to pay.  (Tr. 268-69).  Ms. Huff noted that Plaintiff needs reminders to take her medication, has difficulty completing tasks, concentrating, understanding, and following instructions.  (Tr. 267, 270). Ms. Huff reported that Plaintiff reads and talks on the phone daily.  (Tr. 269).  Ms. Huff

stated that Plaintiff did not have any problems getting along with people and authority figures.  (Tr. 270-71).  Ms. Huff reported that Plaintiff could walk fifty feet before needing to stop and rest for fifteen minutes before she can resume walking.  (Tr. 270).

### III.   Legal Standards and Plaintiff's Alleged Errors

To receive benefits under the Act, a claimant must establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A). The Act requires that a claimant for disability benefits show that:

> He is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The ALJ uses a five-step evaluation process to determine if a person is eligible for disability benefits. *See* 20 C.F.R. § 404.1520. The ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the

claimant's impairment meets or equals a listed impairment from 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing"); (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. *See* 20 C.F.R. §§ 404.1520. Before step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC"). 20 C.F.R. §§ 404.1520(e).

The disability determination involves shifting burdens of proof. The claimant bears the burden of proof at steps one through four.  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that the claimant can perform. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  The ultimate burden of proving disability under the Act lies with the claimant.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

With due deference to the Commissioner's construction of social security rulings and regulations, the court may reverse the Commissioner's final determination if the ALJ did not properly apply the legal standards.  *See* 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2166-67 (2012) (deference to agency interpretation of its own regulations); *Sanfilippo v. Barnhart*, 325 F.3d 391, 393 (3d Cir. 2003) (plenary review of legal questions in social security cases); *see also Witkowski v. Colvin*,

999 F. Supp. 2d 764, 772-73 (M.D. Pa. 2014) (citing *Poulos v. Commissioner of Social Security*, 474 F.3d 88, 91 (3d Cir. 2007)).   The court may also reverse the Commissioner if substantial evidence does not support the ALJ's decision.   *See* 42 U.S.C. § 405(g); *see also Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008); *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.1986).   Substantial evidence is a deferential standard of review.  *See Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Substantial evidence is "less than a preponderance" and "more than a mere scintilla."  *Jesurum v. Sec'y of U.S. Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

## A. Third Party Lay Testimony

Plaintiff argues that is was reversible error for the ALJ to assign "limited weight" to Ms. Huff's report "without providing a single legitimate reason."  Pl. Brief at 23-24.  In the December 2013 opinion, the ALJ gave little weight to Ms. Huff's function report because she was "not a psychological or medical

professional" and that her opinion was "inconsistent with [Plaintiff's] treatment records as a whole, as set forth above." (Tr. 21-22).

Observations of a plaintiff made in third party lay statements are valid sources for an ALJ to consider. *E.g.*, 20 C.F.R. § 404.1513(e)(2); SSR 96-7p; *see e.g.*, SSR 13-2p (question 6(b), question 8(c)(ii)) (discussing the relevance of "'other' non-medical" sources such as family and friends). Social Security Ruling 96-7p, states that:

> Other sources may provide information from which inferences and conclusions may be drawn about the credibility of the individual's statements. Such sources may provide information about the seven factors listed in the regulations and may be especially helpful in establishing a longitudinal record. Examples of such sources include . . . nonmedical sources such as family and friends.

SSR 96-7p. The unsubstantiated disregard of such third party statements amounts to error. *See* 20 C.F.R. § 404.1513(e)(2); *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999); *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987); *Escardille v. Barnhart*, No. CIV.A. 02-2930, 2003 WL 21499999, at *7-8 (E.D. Pa. June 24, 2003). As the Ninth Circuit observed, "[d]isregard of [third party lay statements] violates the Secretary's regulation that he will consider observations by non-medical sources as to how an impairment affects a claimant's ability to work." *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987) (citing 20 C.F.R. § 404.1513(e)(2)) (finding that testimony from a plaintiff's daughter to be fully competent to substantiate doctor's diagnosis of a plaintiff's depression).

The ALJ erred to disregard Ms. Huff's report due to the fact that she is not medical professional.  *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("When a conflict in the evidence exists, the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'").  As, the Ninth Circuit also observed, "testimony from lay witnesses who see the claimant every day is of particular value . . . ."  *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996).  The Court finds that the ALJ's vague additional reason that Ms. Huff's statement was inconsistent with Plaintiff's treatment records is insufficient to allow the Court meaningful review in light of the erroneous reason for rejecting Ms. Huff's report on the grounds that she is not a medical professional and that Ms. Huff's report is consistent with other evidence that the ALJ rejected.  *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (finding that the ALJ must "ensure that there is sufficient development of the record and explanation of findings to permit meaningful review.").

The Court cannot find harmless error in this instance and the ALJ's rejection of Ms. Huff's statement requires a remand.

## B. Weight of Treating Physician Opinion

Plaintiff asserts that the ALJ erred in not giving sufficient weight to Dr. Wehman's treating source medical opinions from September 2013 and October 2013.  Pl. Brief at 10-20.  With regard to Plaintiff's mental health-related

limitations, the Court notes that the ALJ gave "significant weight" to the non-examining April 2012 opinion of Dr. Poloni. (Tr. 20). The ALJ wrote that:

> Dr. Wehman's opinions are inconsistent with each other regarding [Plaintiff's] ability to interact with others in work setting and with his own treatment notes of record and his GAF assessments of the claimant from March 2013 to August 2013. Also, Dr. Wehman noted that the claimant had experienced episodes of decompensation in his September 2013 assessment but then indicated the following month that she has not had any episodes of decompensation. There is also no evidence of record to support Dr. Wehman's indication that [Plaintiff] is likely to decompensate with a minimal increase in mental demands or is unable to function outside of her home. Dr. Wehman's opinions appear to be based upon the claimant's less than credible subjective complaints of her symptoms, including her alleged paranoia in September 2013. However, the record contains no indication that [Plaintiff] had complained of such symptoms previously. His opinion is also inconsistent with [Plaintiff's] own reported activities of daily living, as described below.

(Tr. 21).

Generally, there is a hierarchy of weight allotted between three types of physician opinions: opinions of those who treat the claimant (treating physicians) are given more weight than opinions by those who examine but do not treat the claimant (examining physicians), and the opinions of examining physicians are given greater weight than the opinions of those who neither examined nor treated the claimant (non-examining physicians). *See* 20 C.F.R. §§ 404.1527(c)(1)-(2), 416.927(c)(1)-(2); SSR 96-6p ("The regulations provide progressively more rigorous tests for weighing opinions as the ties between the source of the opinion and the individual become weaker."); *see also* Standards for Consultative

Examinations and Existing Medical Evidence, 56 FR 36932-01 at *36936 ("as long as the treating source is someone entitled to special deference, and all other factors are equal, we will always give more weight to treating source medical opinions than to opinions from other sources"); *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) ("A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.").

Pursuant to SSR 96-6p, an ALJ may only assign less weight to a treating source opinion based on a non-treating, non-examining medical opinion in "appropriate circumstances." SSR 96-6p.[4] SSR 96-6p does not define "appropriate circumstances," but provides an example: when the non-treating, non-examining source was able to review a "complete case record . . . which provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.* This example does not constitute the only possible appropriate circumstance to assigning greater weight than a treating medical opinion, but the phrase "appropriate circumstances" should be construed as a similarly compelling reason. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 223, 128 S. Ct. 831, 838, 169 L. Ed. 2d 680 (2008) ("when a general term follows

---

[4] The ALJ is bound by SSR 96-6p. *See* 20 C.F.R. § 402.35(b)(1) (Social Security Rulings are "binding on all components of the Social Security Administration").

a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration").

The Third Circuit has reaffirmed the prohibition of lay reinterpretation of medical evidence even when there is a contradictory medical opinion. In *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352 (3d Cir. 2008) and *Morales*, the Third Circuit held that a single non-treating medical opinion was not sufficient to reject a treating source medical opinion.  *See Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317.  In contrast, in *Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011), the Third Circuit held that an ALJ properly rejected a treating source medical opinion where the ALJ relied on two consistent non-treating medical opinions, one from an expert who reviewed the complete record through the hearing date. *Id.* at 196.

If a non-examining agency source precedes the treating source opinion and thus did not review material medical evidence necessary for a complete review of the record, the ALJ will be required to reinterpret the remainder of the record in order to reject a treating source opinion.  Consistent with 96-6p, the Third Circuit has not upheld, in a precedential decision, any ALJ who assigns less weight to a treating source opinion based only on a single non-treating, non-examining medical opinion from a source who did not review the entire case record.  *See Brown v. Astrue*, 649 F.3d 193 (3d Cir. 2011); *Diaz v. Comm'r of Soc. Sec.*, 577

F.3d 500 (3d Cir. 2009); *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, (3d Cir. 2008); *Morales*, 225 F.3d at 317.[5]   In *Brownawell* and *Morales*, the Third Circuit held that a single non-treating, non-examining medical opinion was not sufficient to reject a treating source medical opinion.  *See Brownawell*, 554 F.3d at 352; *Morales*, 225 F.3d at 317.   The court in *Morales* emphasized that the non-treating, non-examining source reviewed an incomplete case record.  *See Morales*, 225 F.3d at 314 (non-treating, non-examining source "review[ed] [claimant's] medical record which . . . did not include [two physicians'] reports").   In *Brownawell*, an examining source opinion corroborated the treating source medical opinion.  In *Diaz v. Comm'r of Soc. Sec.*, 577 F.3d 500 (3d Cir. 2009), there were three non-treating medical opinions and one treating medical opinion, but the Court held that the non-treating medical opinions did not provide good enough reason to reject the treating source medical opinion because they were "perfunctory" and omitted significant objective findings.  *Id*. at 505.

---

[5] Congress has since amended the Act to require medical expert review of the medical evidence for any claimant who establishes any medically determinable impairment. *See* BIPARTISAN BUDGET ACT OF 2015, PL 114–74, November 2, 2015, 129 Stat 584, § 832(a). This amendment recognizes that medical evidence requires review by an individual with medical training, rather than lay interpretation. *See also North Haven Board of Education v. Bell*, 456 U.S. 512, 535, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) ( "Although postenactment developments cannot be accorded 'the weight of contemporary legislative history, we would be remiss if we ignored these authoritative expressions") (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 686 n. 7, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)); (*INS v. Cardoza–Fonseca*, 480 U.S. 421, 430, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987)).

Dr. Wehman was an acceptable medical source who treated Plaintiff "a number of times and long enough to have obtained a longitudinal picture of [Plaintiff's] impairment[s]." 20 C.F.R. § 404.1527(a), (c)(2); *see also* (Tr. 353-57, 370-74, 378-80, 384-91, 394, 398-402).   Dr. Wehman's medical opinions regarding the nature and severity of Plaintiff's mental impairments were not statements on an issue reserved to the Commissioner.   *See* 20 C.F.R. §404.1527(c)(2).   The non-examining agency physician, Dr. Poloni, did not address a pattern of exacerbations and improvements of symptoms over a period of time, and did not review records: 1) from March 2013, where Plaintiff reported auditory hallucinations when she had been off her medication for a year (Tr. 373); 2) her fluctuating GAF scores between 40 and 60 from March 2013 to October 2013, and 3); Dr. Wehman's opinions from September 2013 and October 2013. The ALJ erred in giving greater weight to Dr. Poloni's opinion which did not benefit from reviewing these significant records from March 2013 to October 2013.  *See Kreiser v. Colvin*, No. 3:15-CV-1603, 2016 WL 704957, at *13 (M.D. Pa. Feb. 23, 2016) (Noting that expert "reviewed records…through November 2012" and "the record does not appear to contain….treatment records which post date [the expert's] opinion"); *Garcia v. Colvin*, No. 3:15-CV-0171, 2016 WL 1695104, at *15 (M.D. Pa. Apr. 26, 2016) (Nealon, J.) (remanding because the

ALJ erred in relying on non-examining, non-treating physician where "the entire medical record was not available to the non-examining, non-treating physician").

Given the great significance of Plaintiff's credibility to substantiate her subjective psychological impairments, and the ALJ's error in disregarding Ms. Huff's report, substantial evidence does not support the ALJ's discounting Dr. Wehman's opinion on the basis of Dr. Wehman's reliance on Plaintiff's subjective report. *See Voorhees v. Colvin*, No. 3:13-CV-02583-GBC, 2015 WL 5785830, at *18 (M.D. Pa. Sept. 30, 2015).   While Plaintiff's ADLs may reflect greater functioning when her conduct was being regulated by her ex-husband or sister, it is unclear whether such functioning would remain if she were to resume work on a fulltime basis and the greater functioning ADLs, in this instance, are insufficient to contradict the treating physician's opinion and Ms. Huff's statement.   *See Voorhees v. Colvin*, No. 3:13-CV-02583-GBC, 2015 WL 5785830, at *18-25 (M.D. Pa. Sept. 30, 2015).

Moreover, the ALJ has a duty to recontact Dr. Wehman to clarify the inconsistencies with his opinions.  As the Administration explained:

> Some commenters were concerned that the proposed language of §§ 404.1527(b) and (c), and 416.927(b) and (c) permitted us to discount a treating source's apparently unsupported opinion without recontacting the source, and that the rules placed highly restrictive conditions on obtaining additional information from treating sources.
>
> Response: To the contrary, recontact with treating sources to complete the case record and to resolve any inconsistencies in the evidence is

one of the principal provisions of this set of rules. See §§ 404.1512(d) and 416.912(d) of these final regulations. Far from being restrictive, the intent of these rules is to require such contacts.

Standards for Consultative Examinations and Existing Medical Evidence, 56 FR 36932–01, 36951–36952; *see also* 20 C.F.R. § 404.1512(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports"); SSR 96-5p ("Because treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion").  There is no evidence in the record that the ALJ attempted to recontact Dr. Wehman.

Based on the foregoing, the Court finds that it was reversible error for the ALJ to grant greater weight to the opinion of Dr. Poloni over Dr. Wehman's opinions.

## A.     Other Allegations of Error

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot.  *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## B.     Remedy

Remand, rather than reversal and award of benefits, is the appropriate remedy in this case. *See Markle v. Barnhart*, 324 F.3d 182, 189 (3d Cir. 2003) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation") (internal quotations omitted)).

## IV.     Conclusion

The undersigned recommends that the Court vacate the decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and remand the case for further proceedings.

Accordingly, it is HEREBY RECOMMENDED:

1.     The decision of the Commissioner of Social Security denying Plaintiff's benefits under the Act be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence.

2.     The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to

which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

Dated: July 7, 2016             _____s/Gerald B. Cohn_____

                                      GERALD B. COHN
                                      UNITED STATES MAGISTRATE JUDGE